CHIESA SHAHINIAN & GIANTOMASI PC
105 Eisenhower Parkway
Roseland, NJ  07068
973.325.1500
Matthew E. Beck, Esq.
Adam K. Derman, Esq.
Alan Mohl, Esq.
*Attorneys for Defendants, Counterclaimants*
*and Third-Party Plaintiffs LG Electronics, USA, Inc.*
*and LG ELECTRONICS MOBILECOMM USA, INC.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GS LINE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>LG ELECTRONICS, USA, INC. and LG ELECTRONICS MOBILECOMM USA, INC.,<br><br>Defendants. | Civil Action No. 2:23-cv-21528<br><br>**DEFENDANTS' ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, COUNTER-CLAIMS AND THIRD PARTY-COMPLAINT** |
| LG ELECTRONICS, USA, INC. and LG ELECTRONICS MOBILECOMM USA, INC,<br><br>Third-Party Plaintiffs,<br><br>vs.<br><br>ANTHONY ROSSI, DEBORAH HULL ROSSI, BRIAN NORMANN, JUSTIN BLISS, ADAM GARCIA and HURLEY MARKETING GROUP.<br><br>Third-Party Defendants. | |

Defendants LG Electronics, USA, Inc. and LG Electronics MobileComm USA, Inc.

(collectively "Defendants" or "LG") by and through counsel, hereby responds to the Complaint of

plaintiff GS Line, Inc. ("Plaintiff" or "GSL") and asserts counter-claims against GSL and a Third-

Party Complaint against Anthony Rossi, Deborah Hull Rossi, Brian Normann, Justin Bliss, Adam Garcia and Hurley Marketing Group as follows:

## ANSWER TO "THE PARTIES"

1.      Defendants admit that during the time period relevant to this litigation, GSL on occasion provided promotional and marketing services.

2.      Defendants admit that LG Electronics USA, Inc. sells and markets certain consumer electronics in the United States.

3.      Defendants admit that LG Electronics MobileComm previously sold and marketed cell phone, portable wireless-enabled PCs and related accessories in the United States but denies that it continues to do so.

## ANSWER TO "JURISDICTION & VENUE"

4.      Paragraph 4 of the Complaint sets forth a legal conclusion for which no response is required.

5.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint.

6.      Defendants admit the allegations of Paragraph 6 of the Complaint.

7.      Defendants deny the allegations of Paragraph 7 of the Complaint.

8.      Defendants admit the allegations of Paragraph 8 of the Complaint.

9.      Paragraph 9 of the Complaint sets forth a legal conclusion for which no response is required.

## ANSWER TO "FACTS COMMON TO ALL CLAIMS"

10.      Defendants admit the allegations of Paragraph 10 of the Complaint.

4883-0687-9631

11.    Answering Paragraph 11 of the Complaint, Defendants admit only that Plaintiff had submitted invoices to Defendant.  Defendants deny the remaining allegations contained in Paragraph 11 of the Complaint.

12.    Answering Paragraph 12 of the Complaint, Defendants admit only that Plaintiff and Defendants entered into contracts and that Defendants received invoices from Plaintiff. Defendants deny the remaining allegations contained in Paragraph 12 of the Complaint.

13.    Answering Paragraph 13 of the Complaint, Defendants admit that LG personnel conducted an audit of the amounts paid to GS Line which, as described in the counterclaims and third-party complaint below, reveled that, on information and belief, GSL, along with the Third-Party Defendants, embezzled significant amounts of money from LG. Defendants deny the remaining allegations contained in Paragraph 13 of the Complaint.

14.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

15.    The allegations in Paragraph 15 of the Complaint refer to documents, the content of which speak for themselves. Defendants refer to the documents for their contents, deny any allegations, wrongdoing or characterizations inconsistent therewith, and leave Plaintiff to its proofs.

16.    Defendants deny the allegations contained in Paragraph 16 of the Complaint.

17.    Answering Paragraph 17 of the Complaint, Defendants admit only that in 2020, Defendants conducted an audit of the amounts paid to GSL. Defendants deny the remaining allegations contained in Paragraph 17 of the Complaint.

4883-0687-9631

18.    Answering Paragraph 18 of the Complaint, Defendants admit that as part of its 2020 audit, Defendants requested documents and information from Plaintiff and that Plaintiff failed to provide all the documents and information requested. Defendants deny the remaining allegations contained in Paragraph 18 of the Complaint.

19.    Defendants admit the allegations of Paragraph 19 of the Complaint.

20.    Defendants deny the allegations contained in Paragraph 20 of the Complaint.

21.    Defendants deny the allegations contained in Paragraph 21 of the Complaint.

22.    Defendants deny the allegations contained in Paragraph 22 of the Complaint.

23.    Answering Paragraph 23 of the Complaint, Defendants admit only that Defendants and Plaintiff had a contractual relationship whereby Plaintiff would provide services and would then invoice Defendants for those services. Defendants deny the remaining allegations contained in Paragraph 23 of the Complaint.

24.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

25.    Defendants deny the allegations contained in Paragraph 25 of the Complaint.

26.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

27.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

4883-0687-9631

28.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

29.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

30.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

31.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

32.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

33.    Defendants deny the allegations contained in Paragraph 33 of the Complaint.

## ANSWER TO "COUNT ONE: BREACH OF CONTRACT"

34.    Defendants hereby restate and incorporate by reference their responses to the foregoing paragraphs as if fully and completely restated herein.

35.    The allegations in Paragraph 35 of the Complaint refer to documents, the content of which speaks for themselves. Defendants refer to the documents for their contents, deny any allegations, wrongdoing or characterizations inconsistent therewith, and leave Plaintiff to its proofs.

4883-0687-9631

36.     To the extent Paragraph 36 of the Complaint states a legal conclusion, no response is required, and Defendants leave Plaintiff to its proofs. To the extent the allegations of Paragraph 36 of the Complaint are construed as factual allegations, Defendants deny said allegations.

37.      Defendants deny the allegations contained in Paragraph 37 of the Complaint.

## ANSWER TO "COUNT TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING"

38.     Defendants hereby restate and incorporate by reference their responses to the foregoing paragraphs as if fully and completely restated herein.

39.     The allegations in Paragraph 39 of the Complaint refer to documents, the content of which speaks for themselves. Defendants refer to the documents for their contents, deny any allegations, wrongdoing or characterizations inconsistent therewith, and leave Plaintiff to its proofs.

40.     To the extent Paragraph 40 of the Complaint states a legal conclusion, no response is required, and Defendants leave Plaintiff to its proofs. To the extent the allegations of Paragraph 40 of the Complaint are construed as factual allegations, Defendants deny said allegations.

41.     Defendants deny the allegations contained in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations contained in Paragraph 43 of the Complaint.

## ANSWER TO "COUNT THREE: UNJUST ENRICHMENT"

44.     Defendants hereby restate and incorporate by reference their responses to the foregoing paragraphs as if fully and completely restated herein.

45.     To the extent Paragraph 45 of the Complaint states a legal conclusion, no response is required, and Defendants leave Plaintiff to its proofs. To the extent the allegations of Paragraph 45 of the Complaint are construed as factual allegations, Defendants deny said allegations.

4883-0687-9631

46.    Defendants deny the allegations contained in Paragraph 46 of the Complaint.

**ANSWER TO "COUNT FOUR: DEFAMATION"**

47.    Defendants hereby restate and incorporate by reference their responses to the foregoing paragraphs as if fully and completely restated herein.

48.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 of the Complaint because Plaintiff has not adequately plead the details of the statement it claims was made and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

49.    Defendants deny the allegations contained in Paragraph 49 of the Complaint.

50.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 of the Complaint because Plaintiff has not adequately plead the details of the statement it claims was made and, therefore, neither admit or deny said allegation and leave Plaintiff to its proofs as to same.

51.    Defendants deny the allegations contained in Paragraph 51 of the Complaint.

52.    Defendants deny the allegations contained in Paragraph 52 of the Complaint.

**ANSWER TO "COUNT FIVE: TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE"**

53.    Defendants hereby restate and incorporate by reference their responses to the foregoing paragraphs as if fully and completely restated herein.

54.    To the extent Paragraph 54 of the Complaint states a legal conclusion, no response is required, and Defendants leave Plaintiff to its proofs. To the extent the allegations of Paragraph 54 of the Complaint are construed as factual allegations, Defendants deny said allegations.

55.    Defendants deny the allegations contained in Paragraph 54 of the Complaint.

56.    Defendants deny the allegations contained in Paragraph 56 of the Complaint.

4883-0687-9631

57. Defendants deny the allegations contained in Paragraph 57 of the Complaint.

58. Defendants deny the allegations contained in Paragraph 58 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of laches, unclean hands, and/or, in whole or in part, by the doctrine of waiver.

### THIRD AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the applicable statute of limitations.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the principles of estoppel.

### FIFTH AFFIRMATIVE DEFENSE

Any damages sustained by Plaintiff were proximately caused by Plaintiff's own conduct, negligence, or omissions.

### SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the principles of frustration of purpose.

### SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the principles of impossibility of performance.

### RESERVATION OF RIGHTS

Defendants reserve the right to assert further defenses as they become evident through discovery or investigation.

4883-0687-9631

**WHEREFORE**, Defendants demand judgment be entered in their favor and against GS Line, Inc., dismissing GS Line, Inc.'s Complaint with prejudice and awarding fees, costs, and such other relief as this Court deems just and equitable.

## <u>JURY DEMAND</u>

Defendants demand a trial by jury on all issues in the case.

## <u>DEMAND FOR STATEMENT OF DAMAGES</u>

Pursuant to L. Civ. R. 8.1, Defendants hereby request a statement of the amount of damages claimed within fourteen (14) days after service of this pleading.

4883-0687-9631

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

## NATURE OF ACTION

1.      This Counterclaim and Third-Party Complaint arises out of Plaintiff/Counterclaim Defendant GS Line, Inc. ("GSL"), and Third-Party Defendants Anthony Rossi, Deborah Hull Rossi ("Deborah Rossi" and combined with Anthony Rossi, "the Rossis"), Brian Normann, Justin Bliss, Adam Garcia and Hurley Marketing Group's conspiracy and scheme to defraud Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs LG Electronics, USA, Inc. and LG Electronics MobileComm USA, Inc. (collectively, "LG"), by unlawfully converting and embezzling LG's marketing and programming funds for themselves.

2.      As part of its customer contracts with cellular services providers ("Carriers") like Verizon, AT&T and T-Mobile, LG set aside certain funds for marketing and promotional expenses. Typically, these Marketing Development Funds ("MDF") were spent by the Carrier customers to promote LG's products. On occasion, however, LG's Carrier customers would designate vendors to run the promotional programs, and, in those circumstances, the vendor would contract directly with LG.

3.      In or around 2015, T-Mobile designated a vendor, Defendant GSL, to run its marketing and promotional activities associated with its MDF. Upon information and belief, defendant Justin Bliss was employed by T-Mobile at the time, and he and defendant Brian Normann were involved with registering GSL as a vendor with LG.  Those programs were meant to encourage T-Mobile employees to market LG's products and T-Mobile's end user customers to buy more LG products.  Between 2015 to 2020, LG contracted with GSL and signed individual agreements, called Requests for Support ("RFS"), for each promotional program. During that time, LG paid GSL more than $34 million dollars in MDF for promotional programs.

10

4883-0687-9631

4.      In 2020, LG commenced an audit (the "Audit") of the amounts paid to GSL.  That Audit revealed that GSL, through its owners the Rossis, regularly and intentionally billed LG for services not performed and overbilled LG for programs that GSL was contracted to run.  To date, it appears that LG was overbilled by at least $5 million but, on information and belief, that number will grow when LG is able to obtain access to GSL's books and records.

5.      The Audit also revealed that GSL and the Rossis conspired with former LG employees to commit their wrongdoing, including with Defendants Brian Normann and Justin Bliss who were, at different times, responsible for managing the T-Mobile account for LG and Defendant Adam Garcia who worked closely with Normann and Bliss.

6.      While GSL and the Rossis appear to have kept detailed records of the amounts that they had billed LG in excess of the actual cost of the promotional programs it undertook and at times referred to those funds as being "escrow" or "breakage," those records were never uploaded to LG's systems.  Instead, the Audit discovered references to them by searching in emails that were sent just to defendants Normann and Bliss.

7.      The Audit also uncovered concerning interrelationships between the Rossis and Normann as well as unexplained wealth that Normann displayed.  Notably, Normann and the Rossis each set up a family foundation on the same exact date in 2019 which was four years and tens of millions of dollars into GSL's relationship with LG. Defendant Anthony Rossi was named a Trustee of Normann's family foundation and Normann was named as a trustee of the Rossi family foundation.  Further tying the foundations together, GSL's counsel and is its legal registered agent, William Weatherford, is also the registered agent for both the Normann and Rossi family foundations.

8.    In addition, and as described in greater details below, a separate company named Hurley Marketing Group ("Hurley Marketing") which was purportedly owned by Normann's father-in-law and whose legal registered agent was also attorney Weatherford, was paid significant sums by GSL while LG and GSL were working together.  Notably, Hurley Marketing dissolved immediately after Normann resigned from LG in August 2020.

9.    In a display of unexplained wealth, in March 2020, Normann purchased a luxury $2 million property on the water in Florida in an all-cash transaction.  Yet again, attorney Weatherford was involved in this purchase as he acted as both the attorney for the purchase and it the legal registered agent for a company that Normann set up to rent out his investment property.

10.    As it relates to defendant Bliss, LG intended to terminate his employment in December 2020 based on information learned through the Audit.  The day before he was scheduled to be terminated, defendant Bliss resigned effective immediately.   Following his resignation, Bliss had an attorney contact LG to discuss his firing.  During those discussions, Bliss's counsel represented that Bliss knew that his and Normann's conduct was problematic and that he had been asked to "do things that made him uncomfortable."

11.    Since the Audit was commenced in 2020, LG, both directly and through counsel, has tried to obtain information from GSL to better understand the overbilling scheme and uncover how much money was improperly diverted by GSL, the Rossis, Normann, Bliss and Garcia.  GSL, however, failed and refused to provide sufficient information and documentation to support its improper charges or to acknowledge its wrongdoing.

12.    Instead, and in a clear attempt to deflect its wrongdoing, GSL has sued LG to recover payment for invoices they claim were unpaid by LG.  GSL's claims are without basis. Instead, it is LG who has been harmed by GSL and Third-Party Defendants wrongful conduct.

4883-0687-9631

Accordingly, LG has filed this Counterclaim and Third-Party Complaint to recover, among other damages, the amounts that were improperly taken from it.

## PARTIES

13. Defendant/Counterclaim Plaintiff/Third-Party Plaintiff LG Electronics, USA, Inc. ("LG Electronics") is a New Jersey corporation with its principal place of business at 111 Sylvan Avenue, Englewood Cliffs, New Jersey 07362 and is a citizen of New Jersey. LG Electronics sells various consumer electronics, home appliances and other high-quality products.

14. Defendant/Counterclaim Plaintiff/Third-Party Plaintiff LG Electronics MobileComm USA, Inc. ("LG Mobile") was a California corporation with its former principal place of business at 1010 Old Grove Road, San Diego, California 92131. Effective August 1, 2018, LG Mobile merged into LG Electronics. LG Mobile was LG's North American business unit responsible for its mobile business. On or about April 5, 2021, LG Electronics, Inc., LG Mobile's parent company, announced that it was closing its mobile business unit worldwide. Following that announcement, LG Mobile's business was wound down and LG Mobile stopped selling LG mobile products.

15. Plaintiff/Counterclaim Defendant GS Line, Inc. is a Florida corporation with its principal place of business at 959 Explorer Cove, #123, Altamonte Springs, Florida 32701. GSL is a company that runs marketing and promotional programs and contracted with LG between 2015-2020 to provide these services.

16. Third-Party Defendant Anthony Rossi is an individual residing in Florida. Rossi is the co-owner of GSL and spouse of Deborah Rossi.

17. Third-Party Defendant Deborah Rossi is an individual residing in Florida. Deborah Rossi is the co-owner of GSL and spouse of Anthony Rossi.

4883-0687-9631

18.     Third-Party Defendant Brian Normann is an individual residing in Florida.  He is a former employee of LG who was Head of Sales for the T-Mobile account from approximately 2015 until July 2019.  In that role, he worked closely with GSL and the Rossis.  In approximately July 2019, Normann was reassigned to be the Head of Sales for a different LG Carrier customer that is not associated with T-Mobile.  Normann resigned from LG in August 2020 during the pendency of LG's Audit and after questions about his conduct with GSL and Hurley Marketing had been raised.

19.     Third-Party Defendant Justin Bliss is an individual now residing in Idaho and who resided in the State of Washington during the time he worked for LG.  Between 2015 and 2019, Bliss was part of Normann's sales team for the T-Mobile account.  After Normann was transferred away from the T-Mobile account in approximately July 2019, Bliss was promoted to Head of Sales for the T-Mobile Account.  In that position, Bliss worked closely with GSL and the Rossis.  LG intended to terminate his employment in December 2020 based on information learned through the Audit.  The day before he was scheduled to be terminated, defendant Bliss resigned effective immediately.

20.     Third-Party Defendant Adam Garcia is an individual residing in New York.  He is a former employee of LG who, unlike Defendants Normann and Bliss who worked directly on teams that were dedicated to the Carriers, Garcia was the mobile salesperson responsible for business-to-business sales.  Garcia worked closely with various LG employees who worked directly on teams that were dedicated to the Carriers like Normann and Bliss.  Garcia was terminated by LG in June 2020.

21.     Third-Party Defendant Hurley Marketing Group ("Hurley") was a Florida entity which was owned by Normann's father-in-law and that purported to assist GSL in performing

14

certain programs that LG hired GSL to perform.  Hurley was dissolved immediately following Normann's resignation from LG in August 2020.

<strong><u>JURISDICTION AND VENUE</u></strong>

22.    This Court has subject matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  The citizenship of Third-Party Defendants does not impact the diversity analysis for 28 U.S.C. § 1332.

23.    Venue is proper in the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. § 1391, because LG is a resident of the State of New Jersey and a substantial part of the events and omissions giving rise to these claims occurred in New Jersey.

<strong><u>FACTS COMMON TO ALL CLAIMS</u></strong>

**A.  <u>LG Retains GSL to Perform Lucrative Marketing and Promotional Services</u>**

24.    While it was still in the mobile phone business, LG contracted with various Carriers like Verizon, AT&T and T-Mobile for those companies to sell LG mobile phones.  In order to compete in the highly competitive mobile phone business, LG incentivized its Carriers to market and sell LG phones.  One of the ways that LG did this was to include in its contracts with the Carriers the MDF, which was a set amount of money that LG would allocate (usually millions of dollars a year) for marketing and promotional expenses.  The Carriers could either use the MDF to promote LG's products themselves or they could designate third-party vendors to run the marketing and promotional programs.  In those instances where the Carriers would outsource the marketing and promotional programs, the vendor would contract directly with LG.

25.    T-Mobile was one of LG's few Carrier customers that did not spend its allocated MDF itself but instead chose to designate a vendor to run appropriate marketing and promotion

15

programs.  Upon information and belief, defendant Normann, who was Head of Sales for the T-Mobile account, introduced defendant GSL to T-Mobile after which T-Mobile designated GSL to run its marketing and promotional activities associated with its MDF.

26.    Between 2015 and 2020, Normann and Bliss hired GSL to perform a number of T-Mobile focused marketing and promotional activities.  Some of these programs were directed to T-Mobile salespeople in an effort to encourage them to sell more LG mobile phones.  For example, T-Mobile employees would receive points for selling certain LG products during a limited time period which they could redeem for certain prizes.  The more points a salesperson earned, the nicer the prize they could receive.  Other programs were directed at T-Mobile's end user customers to persuade them to buy LG phones.  For example, T-Mobile's end user customers who switched to an LG phone during certain time periods were guaranteed a certain amount of money when trading in a qualified device.

27.    The promotional programs that LG hired GSL to perform—whether focused on T-Mobile salespersons or end user customers—were often expensive, regularly costing tens to hundreds of thousands of dollars.

28.    In addition to promotional activities, LG also used T-Mobile's MDF to hire GSL to conduct marketing activities to create better brand awareness for LG mobile products.  The most notable example of this was a program referred to as the "Mobile Showroom" program which was the longest and most expensive marketing program that LG contracted GSL to perform.

29.    Of the approximately $34 million LG paid to GSL, approximately $20 million went to this promotion which GSL purportedly performed between the second half of 2016 and the start of Covid-19 in March 2020 when LG terminated the program.  The idea behind the program was to lease cars, outfit them in colorful branded wrapping and then park them outside T-Mobile stores

and other public locations in various territories around the country to drive end user customer engagement and sales.

30.    As per LG requirements and practice, each of the activities LG hired GSL to perform were contractually documented via individual agreements called Requests for Support ("RFS") which were executed by both companies.  Each RFS included sections with the "Requestor Information" (which was GSL and typically Deborah Rossi's contact information), "Program Information" (which included the program name, a description of the program, and the duration of the program was to run), and "Deliverables" (which included sections of what both GSL and LG were required to deliver pursuant to the program).  Each RFS also included and attached LG's Standard Terms and Conditions.

31.    One of LG's Standard Terms and Conditions contained in its RFSs was that GSL had to provide adequate proof of performance to LG that GSL provided the services it was contracted to perform.  That Term and Condition provided: "As a condition to payment by LG, every invoice submitted by Company shall include supporting documentation and/or proof evidencing the completion of performance by Company as required by LG in its sole discretion, including, without limitation, copies of all advertising and marketing materials, sell-through data on LG product, and electronic serial numbers and/or other identifying information on LG product sold pursuant to the Program, as applicable."

32.    LG utilized a computer platform (the "LG Sales Portal") through which vendors like GSL were able to claim and eventually get paid the MDF, by uploading documents, such as proofs of performance, executed RFSs, invoices, and other relevant information in the performance of RFSs.

4883-0687-9631

33.     In total, between 2015 and 2020, LG and GSL entered into more than approximately 280 RFSs pursuant to which LG paid GSL over $34 million to perform marketing and promotional activities on LG's behalf.

34.     Between 2015 and 2019, Normann was the designated employee at LG responsible for the T-Mobile account.  In July 2019, Bliss took over for Normann after Norman was transferred to a different account within LG.  In those roles, Norman and Bliss worked closely with GSL and the Rossis and were the responsible employees that typically contracted with GSL for GSL to provide services to LG.  They were also privy to the amount of MDF funds available to T-Mobile at any time.

35.     The Rossis were involved in the day-to-day operation of GSL, including with respect to the LG account, and frequently communicated with LG and its employees, Normann and Bliss, regarding LG marketing programs and their funding.  The Rossis used the corporate entity, GSL, to perpetuate the fraud against LG.

**B.  LG's 2020 Audit Uncovers Wrongdoing**

36.     In 2020, LG conducted the Audit of its approximately $34 million business relationship with GSL.  The Audit revealed that GSL and the Rossis overbilled LG by millions of dollars for certain programs that it was hired to run, and that Normann, Bliss, Garcia and potentially others often were aware of, facilitated, directed and permitted the overbilling.

37.     While GSL kept detailed records of the amounts that that they had billed LG in excess of the actual cost of the promotional programs it undertook and often referred to those funds as being "escrow" or "breakage," those records were never uploaded to the LG Portal.  Instead, the Audit found references to them in emails that GSL sent to just Normann and/or Bliss.  Notably, after Normann left the T-Mobile account in 2019 and Bliss took over, GSL often continued to

email Normann with details about the amounts that they had overbilled LG and had tracked as either "escrow" or "breakage".

38.     Because LG does not have access to GSL's records, or the Rossi's, Normann's, Bliss's or Garcia's bank records, it was unable to track whether and how much of those funds were ultimately diverted for the personal benefit of the Rossis, Normann Bliss and Garcia.  However, as explained in more detail below, LG uncovered numerous facts that demonstrate that the defendants conspired together to defraud LG for their own personal benefit.

**C.  Examples of the Overbilling Scheme**

39.     The following are just a few examples LG uncovered of the overbilling scheme which demonstrate the large sums of money that GSL, the Rossis and Hurley Marketing were able to wrongfully obtain and use with the assistance of Normann, Bliss and Garcia.

        *a.  The V20 Launch-$200 Rebate Offer*

40.     In October 2016, LG entered into an RFS with GSL whereby GSL was to manage the fulfillment of a $200 rebate that LG offered to T-Mobile's end-user customers who switched to a newly released LG phone (the V20).  The RFS identified Normann and Deborah Rossi as the LG and GSL individuals responsible for the program.

41.     Pursuant to the executed RFS, LG was to pay GSL $7,500 as a setup fee which was to be invoiced at the conclusion of the program.  The RFS also provided that GSL would charge an administrative fee of $5.00 per rebate check issued, also to be invoiced at the conclusion of the program.

42.     To fund the anticipated cost of the rebate check program, GSL invoiced, and LG paid GSL, $1,000,000 up front.  The rebate program turned out to be far less successful than the

4883-0687-9631

$1,000,000 estimate.  At the end of the program, which ran from October 15, 2016 to December 18, 2016, the actual value of the rebates distributed totaled only $282,164.

43.     Rather than return the excess funds to LG, GSL created a "credit memo" reflecting a credit of $702,841 after deducting the set-up and administrative costs and the full amount of the rebate checks.

44.     GSL's "credit memo" was never entered into the LG Portal or submitted to LG corporate, but instead was only sent to Normann by email from a GSL employee.  Normann replied to that email by confirming that that the approximately $700,000 in excess funds was "breakage" that "remains with GS Line."

### b. *Q2 2018 Rewards Incentive Program*

45.     In May 2018, and as an incentive to T-Mobile salespersons to sell more LG phones between May 25 and July 6, 2018, LG created a program where T-Mobile employees would receive points for selling certain LG products.  The employees could use those points to purchase various products like gift cards, travel vouchers, or LG televisions.

46.     LG contracted with GSL to handle all aspects of the program including developing the website for prize redemption, sourcing all prizes, and handling the fulfillment of the program.

47.     The original RFS between LG and GSL for this program, which identified Justin Bliss and Deborah Rossi as the LG and GSL individuals responsible for the program, provided that GSL would be paid the actual costs of the shipping and the materials, $55,000 for set up and maintenance, $5 handling fee per item shipped, and certain additional administrative expenses.

48.     As planned, the program ran for approximately six weeks and ended on July 6, 2018.  The total number of points redeemed by T-Mobile employees during the authorized

4883-0687-9631

promotional period was 153,628 points, resulting in total actual costs of $388,013.12 (a value of approximately $2.50 per point).

49. However, *after* the program had run its course, the RFS for this program was revised so that LG was required to pay GSL $8.00 per point redeemed.  This after-the-fact change in the pricing scheme resulted in GSL billing LG, and LG paying GSL, $1,229,016 which was the *exact* amount remaining in T-Mobile's MDF at that time.  As a result of their responsibilities on the T-Mobile sales team, both defendants Normann and Bliss would have had the ability to know exactly how much was left in the MDF.  And like the original RFS, the revised RFS for this program identified Justin Bliss and Deborah Rossi as the LG and GSL individuals responsible for the program.

50. In addition to GSL being paid almost $1 million more than it was entitled to under the original RFS, some of the money used for the fulfillment of the program was sent to Hurley Marketing.  As more fully described herein, Hurley Marketing was owned by Normann's father-in-law and it dissolved immediately after Normann resigned from LG in August 2020.

      *c.  Q4 2019 T-Mobile Training Incentive*

51. In November 2019, LG contracted with GSL for GSL to run a one-week long contest to incentivize T-Mobile's salesforce to receive training on a new phone that LG was releasing.  Each salesperson who participated in the training would be entered into a drawing to win prizes like LG speakers, LG televisions, LG laptops, travel vouchers, or gift cards.

52. Pursuant to the program's RFS, which again identified Bliss and Deborah Rossi as being responsible for the program, the total maximum cost authorized for the program was $700,000.  To be clear, the RFS did not provide that GSL was to be paid $700,000 but instead that was the maximum amount that could be spent on the program.

53.     At the conclusion of the incentive period which ran between November 9 and December 31, 2019, GSL had spent only $222,259.25.  Despite the fact that the program had only cost $222,259.25, which GSL confirmed in an email, Bliss and GSL agreed that GSL would bill LG for the entire $700,000.  GSL ultimately billed LG for the full $700,000 and agreed to submit certain proof of performance that Bliss directed that they send even though both parties knew that GSL had only spent approximately 222,000.

    d.  *Company 1 Payments*

*54.*     Although GSL had no involvement in the underlying transactions and there were no RFSs between LG and GSL, Garcia apparently asked GSL to make payments to a company that LG had done work with previously ("Company 1").  Despite having no apparent involvement with Company 1 and no RFSs that support the payments, GSL claims to have made three payments to Company 1 in June, October and December 2019 totaling $917,000. GSL has sought repayment of the $917,000 as well as a $31,700 "MDF fee" and a $5,000 administrative fee.

55.     After being informed of his termination, Garcia asked his former supervisor to pay some outstanding invoices from vendors that were unknown to the supervisor. Included in the request was a request to reimburse GSL for payments made to Company 1 despite GSL having no known connection to Company 1 or any work that it may have done for LG.

    e.  *Company 2 Portal*

56.     In April 2020, Defendant Adam Garcia caused LG to contract with GSL purportedly to create and manage an awards portal in which employees and partners of a specific company LG worked with, "Company 2", could redeem points for prizes or awards between April 6, 2020 and May 15, 2020.  Pursuant to the program's RFS, which identified Deborah Rossi as being responsible for GSL, the maximum cost authorized for this program was $400,000.

22

57.     While GSL submitted an invoice dated April 29, 2020 (more than two weeks before the end of the contracted for period) for $400,000 to LG to be paid for this program, GSL never performed the services it was required to under the RFS.  Specifically, GSL never created the awards portal, and never worked with other LG business units to determine the availability and the logistics of redeeming points for LG products through the portal. As a result, Company 2 employees and partners were never able to redeem points for prizes or awards.

f.   *Mobile Showroom*

58.     As described above, LG's longest and most expensive program with GSL was the Mobile Showroom program which involved outfitting leased cars in colorful branded wrapping, and then parking them outside T-Mobile stores and other public locations to drive customer engagement and sales.  LG contracted with GSL via numerous RFSs to perform the Mobile Showroom program between the second half of 2016 and the end of 2020.

59.     In March 2020, at the inception of the COVID-19 pandemic, LG terminated the Mobile Showroom program pursuant to the terms of the RFS.  Prior to doing so, LG had paid GSL approximately $20 million for this promotion.

60.      While numerous RFSs were entered into between GSL and LG for this program, they all required GSL to provide proof of performance to demonstrate that GSL was actually performing the services it was being paid millions of dollars to perform. As the Heads of Sales for the T-Mobile account during the period of the Mobile Showroom program, Normann and later Bliss would have had ultimate responsibility to question any of the proof of performance that was submitted.  Upon information and belief, they never did so.

61.      They should have, however, as the proof of performance that was submitted for the Mobile Showroom was woefully inadequate to confirm that the program was taking place as

4883-0687-9631

frequently and in the numerous locations GSL was being paid to do.  Instead, the proof of performance submitted suggests that GSL simply fabricated the proof of performance to cover for the fact that it did not actually perform the volume of Mobile Showrooms it was contracted to perform.

62.     Specifically, the proof of performance that GSL submitted to LG for the Mobile Showroom program consisted primarily of PowerPoint presentations that purported to include pictures from actual Mobile Showroom displays that GSL conducted on various dates in various locations around the country as well as numeric details regarding the volume and type of customer engagement the Mobile Showroom employees had with potential end user customers.  A review of these PowerPoints revealed that a large number of them contained identical photos of the vehicles and repetitive data that would have been statistically impossible if GSL was truly tracking customer engagement at different locations on different days.

63.     Further evidence of GSL committing wrongdoing with the Mobile Showroom program is that GSL apparently issued five Mobile Showroom related "credit memos" totaling $1.6 million that GSL purportedly issued on the same date December 26, 2018.  Like records relating to the escrow account described earlier, GSL did not upload these credit memos to LG's Portal but instead they were uncovered during the Audit via a search of Normann's email account.

D.  **Undisclosed Family Foundations, Undisclosed Family Businesses, Unexplained Wealth, and Acknowledgements of Wrongdoing**

64.     By late 2019, GSL, the Rossis and Normann had been engaged in this overbilling scheme for more than four years.  In December 2019, both Normann and the Rossis created family foundations where Normann and Anthony Rossi acted as trustees for the others trust.  Those family foundations were each created on the same exact day by the same lawyer, William Weatherford, who is the registered agent for GSL.

4883-0687-9631

65.     Specifically, on December 11, 2019, Normann, with the assistance of attorney Weatherford, created the Normann Family Foundation.  That same day, December 11, 2019, Anthony and Deborah Rossi, with the assistance of attorney Weatherford, created the Rossi Family Foundation.  Anthony Rossi was named a Trustee of the Normann Family Foundation, and Normann was named a Trustee of the Rossi Family Foundation.

66.     Normann never disclosed to his superiors at LG his relationship with the Rossis including that he was a Trustee of a Family Foundation that they had created or that Anthony Rossi was a Trustee of his Family Foundation.

67.     Normann also did not disclose that Hurley Marketing, a supposed third-party marketing company GSL and the Rossis were purportedly using to fulfill certain of GSL's obligations to LG, was owned by his father-in-law.

68.     In addition to Normann's father-in-law owning Hurley Marketing, upon information and belief, Normann was personally involved with and exercised control of Hurley Marketing.  As examples, in or about July 2015, early in GSL's relationship with LG, Hurley Marketing submitted a purchase order to LG.  The metadata for that document reveals that Brian Normann was its author.  In October 2019, Hurley Marketing apparently purchased a luxury box for a Los Angeles Lakers game.  When Hurley Marketing purchased the 20 luxury suite tickets for the basketball game, the invoice for those tickets was sent to Hurley Marketing Group c/o Brian Normann and the $31,050 bill for the tickets was, on information and belief, paid personally by Normann's credit card.

69.     As set forth above, Normann resigned from LG in August 2020 after he had been questioned as part of the Audit.  Notably, at or around the same time that Normann resigned from

4883-0687-9631

LG after being made aware there was an inquiry into his conduct, Hurley Marketing dissolved itself.

70.    On March 11, 2020, and just months before being questioned as part of the Audit and resigning from LG, Normann purchased an approximately $2 million luxury property on the water in Anna Maria, Florida.  Attorney Weatherford was Normann's attorney for the purchase. Upon information and belief, despite neither his nor his wife's salary providing the kind of capital to purchase a home like this outright, Normann made the purchase in an all-cash transaction without taking out a mortgage.

71.    Like Normann's, the circumstances surrounding Bliss's departure from LG demonstrate his involvement in the wrongdoing described herein.  Specifically, after resigning on December 4, 2020 right before he was scheduled to be terminated, an attorney contacted LG to discuss Bliss's departure.  During those conversations, Bliss's attorney acknowledged, among other things, that Normann had asked Bliss to do things that made him uncomfortable, that he followed Normann's directions, and that their actions were problematic.

72.    Over the last approximately three years, as part of the Audit and thereafter, members of LG's audit team and in-house and outside counsel had numerous communications with GSL and its counsel (including attorney Weatherford) seeking information to satisfy its concerns about the unaccounted-for expenditures and the undisclosed relationships.  LG made clear to GSL in those discussions that it would not pay any invoices that GSL claimed were outstanding until it had received satisfactory information that GSL and others had not stolen millions of dollars from LG.  GSL and its counsel were woefully deficient in providing satisfactory explanations during those discussions.

4883-0687-9631

73.     Instead, in what can be considered as a "best defense is a good offense" strategy, GSL instead has responded to questions about its conduct by filing the instant lawsuit and claiming that LG owes GSL more than $5 million for outstanding invoices.

## COUNT I

### FRAUD
### (Against GSL)

74.     LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

75.     As set forth above and herein, GSL made material misrepresentations and concealed materials facts from LG.

76.     Such misrepresentations included, but were not limited to, unlawfully retaining funds for services not performed, retroactively altering pricing to convert funds, and billing LG for programming for never conducted.

77.     In addition, GSL deliberately concealed their financial, business and personal relationships from LG.

78.     GSL took deliberate steps to conceal the truth of these misrepresentations and omissions from LG.

79.     At all times, GSL knew that the misrepresentations made to LG were false and that LG would rely upon those misrepresentations and omissions and, in fact, LG reasonably relied upon such misrepresentations and omissions in continuing its business relationship with GSL.

80.     Upon information and belief, the funds GSL improperly and unlawfully received pursuant to the material misstatements and omissions described herein were diverted in part to the Rossis, Normann, Bliss, Garcia and Hurley Marketing.

81.     As a result of GSL's conduct, LG suffered significant damages.

## COUNT II

### CIVIL CONSPIRACY
### (Against GSL and Third-Party Defendants)

82.     LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

83.     GSL and Third-Party Defendants knowingly and intentionally conspired and agreed with each other and others to execute a scheme to defraud LG of money by means of false and fraudulent acts.

84.     The object of the conspiracy was for the Third-Party Defendants to enrich themselves by causing defendant GSL to fraudulently obtain large amounts of funds from LG beyond what they legitimately were entitled to based on the marketing and promotional work performed on LG's behalf.

85.     As described above, it was part of the conspiracy that Normann and Bliss abused their positions on LG's T-Mobile sales team to permit GSL to unlawfully bill LG for services not performed and overbill LG for marketing and promotional activities.

86.     It was further part of the conspiracy that GSL and the Rossis regularly overbilled LG for services GSL performed and tracked the amount of money that they overbilled as either escrow or breakage.

87.     It was further part of the conspiracy that while Normann and Bliss were aware of GSL and the Rossis tracking of their overbilling of LG, none of the co-conspirators loaded information about the overbilling scheme into the LG Portal in an effort to conceal and keep the unlawful conspiracy from being discovered.

4883-0687-9631

88.     It was further part of the conspiracy that defendants Normann, GSL and the Rossis used Hurley Marketing to unlawfully obtain additional funds from LG without disclosing to LG that Hurley Marketing was owned by Normann's father-in-law.

89.     It was further part of the conspiracy that Garcia agreed to and assisted GSL and the Third-Party Defendants in using LG funds in improper ways.

90.     Upon information and belief, GSL and the Third-Party Defendants used the funds that were unlawfully obtained as a result of the Conspiracy for their own personal benefit.

91.     As part of and in furtherance of the conspiracy, and as described in paragraphs 1 through 69 above, GSL and Third-Party Defendants performed a number of overt acts in furtherance of the conspiracy.

92.     As a result of GSL's and Third-Party Defendants' conduct, LG suffered significant damages.

## COUNT III

### AIDING AND ABETTING FRAUD
### (Against Third-Party Defendants)

93.     LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

94.     GSL defrauded LG to wrongfully obtain millions of dollars that, upon information and belief, Third-Party Defendants the Rossis, Normann, Bliss and Garcia used for their personal benefit.

95.     GSL fraudulently retained overpayments from LG far exceeding the value allowable under the contracts and caused LG to pay for services that were not rendered.

96.     On information and belief, GSL then distributed some of these excess funds to the Third-Party Defendants.

4883-0687-9631

97.    On information and belief, each Third-Party Defendant was aware of, and personally benefited from, these acts by GSL.

98.    There was a coordinated effort between Third-Party Defendants to give assistance and encouragement to ensure GSL acted in bad faith with respect to its contracts with LG.

99.    The Third-Party Defendants participated in GSL's and each other's wrongdoings to defraud LG.

100.    The Rossis, with the assistance of Normann and Bliss, manipulated LG's MDF program in order to ensure GSL would receive the maximum amount of money from LG regardless of whether or how much services were provided.

101.    GSL, through the Rossis, submitted credit memos to LG, which Normann and Bliss accepted, but never uploaded into the LG system to avoid detection.

102.    Normann used his father-in-law's company, Hurley Marketing, to provide a way for GSL to funnel money away from LG.

103.    Garcia assisted in GSL making improper payments to Company 1 and attempting to have LG reimburse GSL for those payments.

104.    The Third-Party Defendant's substantial assistance and encouragement allowed GSL to defraud LG.

105.    As a result of GSL's and Third-Party Defendants' conduct, LG suffered significant damages.

## COUNT IV

### BREACH OF CONTRACT
**(Against GSL)**

106.    LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

4883-0687-9631

107.    LG entered into a series of contracts with GSL between 2015 and 2020 to have GSL run marketing and promotional programs on LG's behalf.

108.    Each program was governed by one or more RFSs.

109.    Pursuant to these RFSs, LG agreed to pay GSL for its marketing, promotion, and other services.

110.    Between 2015 and 2020, LG paid GSL in excess of $34 million.

111.    As described above, GSL overbilled LG for the services actually provided.

112.    GSL also regularly retained funds that were left over at the end of RFS's despite having no contractual right to do so.

113.    GSL also retroactively modified contract terms in order to maximize the amount of MDF funds it obtained from LG.

114.    GSL also failed to provide contracted for services, like the Company 2 portal, to LG.

115.    GSL's improper retention of excess funds, overbilling and retroactive modification of contract terms constitutes a material breach of the contracts.

116.    GSL's failure to perform contracted for services constitutes a material breach of the contracts.

117.    As a result of GSL's breaches, LG has been damaged.

## <u>COUNT V</u>

### **BREACH OF IMPLIED COVENANT GOOD FAITH FAIR DEALING**
### **(Against GSL)**

118.    LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

4883-0687-9631

119.    Implied in every contract is a covenant of good faith and fair dealing that requires both parties to a contract to act in good faith and in adherence to community standards of decency, fairness, and reasonableness.

120.    GSL breached the parties' contracts' implied covenants in a number of ways, including:

    a.    by retaining money that it knew belonged to LG and should have been returned to LG;

    b.    by changing the original contract terms in order to cause LG to overpay and secure a financial windfall for GSL;

    c.    by billing LG for services not performed; and

    d.    by diverting money obtained via RFSs to Hurley Marketing without disclosing to LG that Hurley Marketing was owned by Normann's father-in-law.

121.    GSL's bad faith conduct denied LG the benefit of the full value of the metrics and services described in each RFS.

122.    As a result of GSL's breach of the implied covenant of good faith and fair dealing, LG has been damaged.

## COUNT VI

### CONVERSION
### (Against GSL)

123.    LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

124.    LG contracted with GSL on a number of occasions to run marketing and promotional programs for LG.

4883-0687-9631

125.    LG often paid the maximum amount allowable under the contract in full at the start of the promotion to ensure that GSL had adequate funding to effectuate the programs.

126.    For several of the contracted for programs, GSL did not use all of the funds allocated for the programs.

127.    Such excess funds are LG's property.

128.    GSL improperly converted such excess funds for its use and benefit which was contrary and in conflict with LG's rights.

129.    As a result of GSL's conversion, LG has been damaged.

## COUNT VII

### UNJUST ENRICHMENT
### (Against GSL)

130.    LG repeats and incorporates the allegations in the prior paragraphs as if set forth fully herein.

131.    GSL received payments far exceeding the value of the services provided under certain RFSs.

132.    GSL also received payment for services that it never performed.

133.    As a result, GSL earned unconscionable benefit and advantage from LG and has been unjustly enriched beyond its contractual rights.

134.    As a result of the conduct above, GSL been unjustly enriched at the expense of LG.

4883-0687-9631

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaim Plaintiff/Third-Party Plaintiff LG Electronics, USA, Inc. demands that judgment be entered in favor of LG and against Plaintiff/Counterclaim Defendant GSL, Inc. and Third-Party Defendants, Anthony Rossi, Deborah Rossi, Brian Normann, Justin Bliss, and Hurley Marketing Group, awarding the following relief to LG:

   a) Compensatory damages;

   b) Punitive damages;

   c) Attorney's fees and costs; and

   d) Any other relief that this Court deems appropriate.

## JURY DEMAND

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff LG Electronics, USA, Inc. requests a jury trial as to all issues and counterclaims/third-party claims.

CHIESA SHAHINIAN & GIANTOMASI PC
*Attorneys for Defendants, Counterclaimants and Third-Party Plaintiffs LG Electronics, USA, Inc. and LG ELECTRONICS MOBILECOMM USA, INC.*

By: */s/Matthew E. Beck*
       MATTHEW E. BECK

Dated: December 22, 2023

34

4883-0687-9631